FREDERICK E. COLEMAN, Appellant, v CITY OF NEW YORK, Respondent.

First Department, September 10, 1992

**APPEARANCES OF COUNSEL**

*Martin Diennor* of counsel *(Abraham Fuchsberg* with him on the brief; *Fuchsberg & Fuchsberg,* attorneys), for appellant.

*Julian L. Kalkstein* of counsel *(Larry A. Sonnenshein* with him on the brief; *Victor A. Kovner, Corporation Counsel,* attorney), for respondent.

**OPINION OF THE COURT**

SULLIVAN, J. P.

Plaintiff was arrested on February 15, 1985, and held until February 19, 1985, on a charge of attempted rape. He was never arraigned or indicted, and the charge was subsequently dismissed. Plaintiff later commenced this action for, *inter alia,* false arrest. Finding that the police officers were not justified in arresting plaintiff or in detaining him until the

dismissal of the charge, the jury awarded plaintiff $165,000. After the verdict, the City moved for judgment notwithstanding the verdict on the ground that plaintiff's arrest was, as a matter of law, supported by probable cause. In the alternative, the City moved to set aside the verdict as against the weight of the credible evidence or to set aside or reduce the verdict as grossly excessive. The trial court held that, as a matter of law, plaintiff's arrest was supported by probable cause and granted judgment in the City's favor notwithstanding the verdict. The court also concluded that the verdict was clearly against the weight of the credible evidence and that, in any event, it was grossly excessive. Since we agree that, as a matter of law, the officers had probable cause to arrest plaintiff, we affirm.

Plaintiff testified as to his version of the incident. He stated that he called 911 to obtain medical assistance for a woman who was lying on the hood of a car, apparently unconscious, and that, after making the phone call, when he walked back and leaned over her to see if she was all right, he was approached by two men, one of whom shoved him. The three then "got into a wrestling match" which the police, who arrived within minutes, broke up. Plaintiff testified that the police grabbed him and, when he tried to explain what happened, told him to shut up. At no time, according to plaintiff, did he touch the victim.

Two police officers testified that when they arrived at the scene, a man, identified as plaintiff, was struggling on the ground with two other men. Officer Michael Lewis, the first police officer to respond, testified that the two men who were struggling with plaintiff told them that plaintiff had just raped a woman and was trying to "get loose". The two men insisted that Lewis place plaintiff in handcuffs. The commanding officer, John McDonald, who ordered plaintiff's arrest, testified that, upon his arrival at the scene, he observed a struggle among two men and plaintiff and, some distance away, saw a woman who was crying, holding a garment to her chest. Her upper body appeared to be otherwise unclothed. After telling the woman that they were going to bring someone for her to view, McDonald brought plaintiff over to the woman and asked, "Is this him?" The woman responded, "Get him away from me, get him away from me" and then "broke down in tears." McDonald testified that plaintiff appeared intoxicated and that his clothing was in disarray, with the zipper on his trousers open. Plaintiff told McDonald that he had called the police, and when McDonald asked him what

happened, plaintiff said that "these guys beat me up." McDonald also alluded to conversations he had with the two other men involved in the struggle and with another man on the street who did not appear to be involved. He was not, however, permitted to relate the substance of the conversations; he was only permitted to state that he "determined from the conversations that [he] had with witnesses and the victim and using the physical evidence that [he] could see that a crime had been committed and that [plaintiff] was responsible for the crime."

In addition, an uninvolved bystander, and City University of New York art professor, Bernard Aptekar, who had called 911 to report the incident, testified that he witnessed plaintiff attacking the woman and that he and other witnesses told the police "what we saw" before the police arrested plaintiff. As to the circumstances of the incident, Aptekar stated that it appeared that a man was trying to tear a woman's clothes off and rape her and that the woman was struggling to resist him. He stated that two men interrupted the attack and wrestled the attacker to the ground, holding him there until the police arrived.

" ' "Where an officer, in good faith, believes that a person is guilty of a felony, and his belief rests on such grounds as would induce an ordinarily prudent and cautious man, under the circumstances, to believe likewise, he has such probable cause for his belief as will justify him in arresting without a warrant." ' " (Veras v Truth Verification Corp., 87 AD2d 381, 385, affd 57 NY2d 947, quoting People v Coffey, 12 NY2d 443, 451, cert denied 376 US 916.) CPL 70.10 (2) is in accord: reasonable or probable cause "exists when evidence or information which appears reliable discloses facts or circumstances which are collectively of such weight and persuasiveness as to convince a person of ordinary intelligence, judgment and experience that it is reasonably likely that such offense was committed and that such person committed it. [With exceptions not here relevant], such apparently reliable evidence may include or consist of hearsay." Where the defense of probable cause is based on conflicting evidence, the question is resolved by the jury, but where the facts leading up to the arrest are undisputed, the existence of probable cause is for the court to determine as a matter of law. (Veras v Truth Verification Corp., at 384.)

■ According to the dissent, since plaintiff and defendant offered differing versions of the events, the existence of proba-

ble cause is a factual question which must be submitted to the jury, and the court erred in deciding this issue as a matter of law. Although the facts surrounding the incident are disputed, there is no dispute as to the facts leading up to plaintiff's arrest. These are the only facts relevant to the question of probable cause.

■ As an initial matter, it is clear that the trial court erred in excluding testimony from McDonald as to the witnesses' narrative of the events that had just transpired, since it has always been the rule in civil cases that the police may testify as to the statements made by third parties for the purpose of showing probable cause for an arrest. *(Veras v Truth Verification Corp.,* 87 AD2d, *supra,* at 386; *see also, Barbagallo v Americana Corp.,* 25 NY2d 655.) Such evidence is not offered for the truth of the facts asserted but to establish what was said to the police and how it provided them with a basis for believing that a crime had been committed. *(Veras v Truth Verification Corp.,* at 386.) The dissent argues that since McDonald did not obtain the names of the persons with whom he spoke their account of the event as narrated to the officer was properly excluded. This argument, of course, goes to the weight to be accorded such evidence, not to its admissibility.

■ Even though the City was precluded from eliciting this evidence and was thus figuratively asked to conduct its defense with one hand tied behind its back, the undisputed evidence shows that, upon arriving at the scene, the police were told by various eyewitnesses that plaintiff had attempted to rape a woman, who clearly appeared to be the victim of foul play. While plaintiff attempted to portray himself to the police as her rescuer rather than her attacker, at least one uninterested bystander—Aptekar—told the police otherwise. Although Aptekar did not expressly testify that he told the police that plaintiff was attacking the woman, this is the only fair inference which can be drawn from his statement that he (and the other witnesses) told the police "what we saw." In addition, though the victim did not expressly identify plaintiff as her attacker, her reaction upon viewing him reasonably corroborated the other information on which the officers based their belief that plaintiff had committed a crime. Her repeated appeal to "get [plaintiff] away from [her]", followed by tears, can only be construed as an indication that she was repelled by plaintiff's presence. Moreover, plaintiff was viewed as "attempting to flee or move in a very wild or erratic manner" and, according to McDonald, had his fly unzipped. This

evidence, even in the face of plaintiff's denials,* justified the belief that he had committed a crime. "[W]hat is reasonable cause is a total judgment, a judgment based not upon technicalities, but upon the practicalities and exigencies confronting a prudent man at the moment." *(People v Horowitz,* 27 AD2d 367, 369.)

■ The dissent's conclusion that the police lacked probable cause is based, in part, on the absence of testimony by the victim and the officer who accompanied her to the hospital. It was not necessary, however, for the City to call the victim. From the City's perspective, her testimony would have been, at best, duplicative of that of Officer McDonald and, in any event, could not have been more graphic than Officer McDonald's account of her directive to "get [plaintiff] away from me", followed by her almost immediate emotional outburst. As to the conversation in the ambulance between the victim and the police officer who accompanied her, that is irrelevant to the issue of probable cause, which is based on whether the officers believe that a person is guilty of a crime and whether the facts and circumstances reasonably justify such a belief. *(Veras v Truth Verification Corp., supra,* 87 AD2d, at 385.) If the dissent is suggesting that the victim's testimony might have been helpful to plaintiff, we note that he was, of course, free to call her as a witness. Nor is it relevant whether the jury believed Aptekar's testimony that plaintiff and the victim were struggling; it is only relevant whether the police reasonably believed the accounts which cast plaintiff as her attacker. For our purposes, it matters not whether plaintiff had in fact attempted to rape the victim; the question rather is whether the police had reasonable cause to believe that he had committed the crime.

Accordingly, the judgment of the Supreme Court, New York County (Eugene L. Nardelli, J.), entered on or about October 3, 1990, which awarded judgment in defendant's favor notwithstanding the verdict, should be affirmed, without costs or disbursements.

SMITH, J. (dissenting). This is an action for false arrest. The jury found in favor of the plaintiff and awarded him the sum of $165,000. Following a posttrial motion by the defendant, the trial court set the verdict aside and dismissed the action.

---

* An accused's exculpatory statement does not, of course, negate the existence of probable cause.

Because I believe that it was error to set that verdict aside, I dissent.

The facts at the trial were disputed. Plaintiff Frederick Coleman testified as follows. On February 15, 1985, he was a security guard. At 5:00 P.M. on that day, he left his job and went to his apartment which he shared with his girl friend. He had drinks with his girl friend and his girl friend's female cousin. Around 9:00 P.M. the three went to the Downunder Disço Club located on 58th Street between Park Avenue and Madison Avenue in Manhattan. He had more drinks. Around 11:00 P.M. when he was feeling drunk, plaintiff went outside for air.

Plaintiff testified further that he walked to Park Avenue and 58th Street. He saw two men and a woman on Park Avenue between 57th and 58th Streets. The woman was lying on the hood of a car and was motionless. One of the men had his arm around her and the other was standing nearby. When the plaintiff approached, the men walked away. The woman appeared to be unconscious. Plaintiff called the police emergency number, 911, and stated that shots had been fired and a traffic officer needed assistance. He told this false story in order to get immediate assistance from the police.

After he telephoned the police, plaintiff stated that he went back to the woman who was lying on the sidewalk and still unconscious. He "did not touch her at all" and did not try to pull her clothes off. The two men he had previously seen with the woman approached him and one shoved him from behind. A fight ensued.

Plaintiff also testified that the police arrived and pulled plaintiff off the ground. He was not permitted to speak. The plaintiff was put in a police car and taken to a precinct. He was subsequently taken to Central Booking where his photograph was taken. From there he was taken to Bellevue Hospital where he was x-rayed and his hand treated. Plaintiff was confined to the prison ward at Bellevue until February 19, 1985. He was never arraigned or indicted.

Neither woman who was with plaintiff that evening testified. Plaintiff said he had not seen his former girl friend for over a year before the trial. He had not heard from the other woman in three years, and at that time she was in England.

Lieutenant John McDonald ordered plaintiff's arrest for attempted rape. He testified as follows. He went to the scene because of a radio dispatch. He saw two males struggling with

the plaintiff. He also saw a woman who appeared to be unclothed except for a garment which she was holding to her chest. When he asked her if she was all right, the woman waved him off. When the police brought the plaintiff to her, the woman stated, "Get him away from me, get him away from me." She then began to cry.

Specifically, on cross-examination, Lieutenant McDonald testified as follows:

"Q. Okay. Now, from what you said when you asked this woman what had happened she didn't respond to you, she just sort of waved you off, isn't that right?

"A. That is correct.

"Q. And you also said that when you brought Mr. Coleman in front of her the only thing that she said according to you, and I will quote, 'Get him away, get him away.' Is that right?

"A. That is correct.

"Q. Did you ask her anything else at that point? Yes or no?

"A. I don't recall."

Lieutenant McDonald spoke to the plaintiff who stated that he (plaintiff) called 911 and that he was beaten up. Specifically, on direct examination, Lieutenant McDonald was asked the following question and gave the following answer:

"Q. What do you recollect of your conversation with the person you arrested saying, Fred Coleman?

"A. I initially recall asking him what happened and his reply was, 'I called you, I called you,' and I assume I responded to that, 'Fine, okay, but what happened?' And he replied that, 'That these guys beat me up.'

"Q. Did he say why he called you?

"A. No, he did not."

Lieutenant McDonald stated that plaintiff appeared intoxicated, his hand was bleeding, his clothes were in disarray and the zipper of his trousers was undone.

Lieutenant McDonald spoke to two men but, apparently, following an unrecorded colloquy at the Bench, was not allowed to give the substance of that conversation. He also spoke to a third man and to the woman. He could not give the names of any of the men or of the woman.

Bernard Aptekar testified as follows. He is an art professor at the City University of New York. He and his wife had attended a movie that night. After it was over he and his wife

walked east along 58th Street and then turned south on Park Avenue. He saw a man, plaintiff, attacking a woman. He thought the man "was trying to rape her." He was "trying to tear her dress off." Two men joined in the fight and the witness, Aptekar, ran to a building to call 911. A police officer took his name. He could not recall if plaintiff's zipper was undone or if the woman's clothing was torn or off.

Officer Michael Lewis testified that he was the arresting officer. When he arrived on the scene, he was told by two men that the plaintiff had just raped a woman. One man was dressed as a doorman. He did not write down the names of the men. The next day, however, he obtained names from a doorman at 470 Park Avenue. The names of the men were John King and John Herion. Officer Lewis did not testify that John King and John Herion were the men to whom he spoke on the previous night.

Officer Lewis testified further that he never spoke with the woman and did not know her name. No statement was taken from the alleged victim. She was accompanied to the hospital by a female police officer, Officer Terry Gay. Officer Lewis testified that the next day he made numerous attempts to contact the woman in New Jersey but was unsuccessful. He did take a rape kit to the police laboratory.

A complaint report signed by Officer Lewis did not identify the alleged victim and further stated that the victim was unconscious at the hospital.

Edward Quinn testified that he was an investigator and was hired to look for John Herion, John King and Bernard Aptekar. He reported that he believed John Herion was not a doorman and that he had not located him. John King, reportedly, had died.

The jury rendered a verdict for plaintiff in the sum of $165,000. Defendant moved "to dismiss the false arrest claim as a matter of law" and "to set aside the verdict insofar as it deals with false arrest and unlawful detention as being excessive and against the weight of the credible evidence". The trial court set the verdict aside. It concluded that on the issue of probable cause, "there is no relevant factual dispute" and "the existence or nonexistence of probable cause to make the arrest is a matter of law for the court to decide". It further concluded that the jury's verdict was clearly against the weight of the evidence and grossly excessive.

On this appeal plaintiff argues that his arrest without a

warrant was unlawful and that defendant failed to meet its burden that the arrest was based on probable cause. He argues further that the verdict was not excessive.

Defendant argues that the police had probable cause to arrest the plaintiff. Specifically, it argues that "[s]ince the testimony of Aptekar, the words of the two men, and observations and testimony of Lieutenant McDonald and Police Officer *[sic]* were undisputed, the issue of probable cause was a matter of law for the trial court to decide." In addition, it urges that the trial court erred in excluding conversations the police had with witnesses at the scene and that the verdict was excessive.

Where the facts which lead to an arrest are undisputed, probable cause is for the court as a matter of law *(Veras v Truth Verification Corp.,* 87 AD2d 381, 384 [1982], *affd* 57 NY2d 947 [1982]). When, however, there is conflicting evidence, probable cause is for the jury *(supra).*

CPL 140.10 (1) (b) authorizes a police officer to arrest a person for a crime "when he has reasonable cause to believe that such person has committed such crime, whether in his presence or otherwise."

CPL 70.10 (2) states that " '[r]easonable cause to believe that a person has committed an offense' exists when evidence or information which appears reliable discloses facts or circumstances which are collectively of such weight and persuasiveness as to convince a person of ordinary intelligence, judgment and experience that it is reasonably likely that such offense was committed and that such person committed it. Except as otherwise provided in this chapter, such apparently reliable evidence may include or consist of hearsay."

It is clear that the issue of probable cause in this case was a factual one which was correctly submitted to the jury. The trial court erred when it concluded, after the jury's verdict, that the issue of probable cause was one of law for the court. Both the plaintiff and the defendant gave differing versions of the events of February 15, 1988. Plaintiff's version was that he was attempting to aid a woman in distress and was mistakenly and unjustifiably arrested by the police. Defendant's version of the events was that there was probable cause to arrest plaintiff for attempted rape.

Moreover, analysis of the evidence shows the complete lack of probable cause for an arrest. First, the alleged victim of the rape never identified plaintiff as the perpetrator of an at-

tempted rape against her. When the lieutenant asked her what had happened, she waved him off. When the plaintiff was allegedly brought to her, she demanded that he be taken away. Second, the alleged victim did not testify and, apparently, was never even contacted by the police after the incident. The jury was entitled to hear from her what had happened to her, particularly given the conflicting testimony as to what occurred. Moreover, it could not have been lost on the jury that a police officer accompanied the alleged victim to the hospital. That officer did not testify or give an indication of what the alleged victim said at the scene or in the ambulance, if anything. To argue, as does the majority, that the woman's testimony would have been duplicative is to ignore the fact that no statement was ever attributed to her either at the scene or after the incident. Moreover, Officer McDonald could not recall if he had recounted everything that the woman said to him. The testimony of the alleged victim, or its absence, was crucial to a determination of whether the police acted reasonably and had probable cause for an arrest.

While the majority states that the plaintiff was free to call the alleged victim, the burden of proving a legal justification for the arrest was on the defendant. *(Veras v Truth Verification Corp.,* 87 AD2d, at 384, *supra.)*

The majority concludes that while the facts of the incident are disputed, the facts leading to the arrest are not. The incident and the facts leading to the arrest cannot be so neatly divided. Only the recounting of the incident could give the police probable cause for the arrest. What occurred was very much in dispute and the resolution of that factual dispute should not have been taken from the jury. Moreover, the facts of the *Veras* case do not support the majority's decision to take the case from the jury. In *Veras* there was no dispute as to the facts which established probable cause. Plaintiff had been arrested for possession of stolen goods, belonging to his employer, after a private undercover investigator reported that he had purchased said goods from plaintiff. The prosecution of the plaintiff ceased and the case was dismissed when the private investigator failed to appear for trial. Plaintiff in *Veras* sued for false arrest and the jury returned an $8,000 verdict against the City of New York. That verdict was overturned because the undisputed facts established probable cause for plaintiff's arrest. It should also be noted that while the information of the undercover was admitted without his testifying, that investigator was known and

named, unlike the unknown and unnamed witnesses whose alleged statements the majority concludes should have been admitted here.

It is simply disingenuous for the majority to take away the plaintiff's right to have his case decided by a jury on the excuse that the facts leading to the arrest, as opposed to the facts of the incident, were undisputed. First, they were disputed by the statement of the plaintiff that he was beaten. Second, despite having the burden of proof on the issue of probable cause, the defendant City did not produce at trial any of the persons allegedly involved in the incident, specifically the alleged victim or the persons with whom the plaintiff fought.

Moreover, the jury was free to accept or reject the testimony of Bernard Aptekar that plaintiff and the victim were fighting. But it was also free to conclude that the testimony itself, even if it showed the two were fighting, did not establish probable cause to believe that a rape was being attempted.

All of these weaknesses could lead a jury to conclude that the defendant had not met its burden of establishing that the police had probable cause to arrest the plaintiff.

It was not error under the circumstances here for the trial court to exclude conversations allegedly had by Lieutenant McDonald with two men at the scene. This is particularly true since the officer, a trained veteran of 23 years service, did not even obtain the names of the persons with whom he spoke. It should be emphasized that there is nothing in the record which indicates that the persons to whom Lieutenant McDonald allegedly spoke on the night of the incident were the same persons whose names were obtained as possible witnesses by Officer Lewis the next day. The court properly excluded the hearsay testimony of unidentified witnesses.

The trial court also erred in concluding that the verdict was against the weight of the credible evidence. The standard necessary for a finding that the verdict is against the weight of the credible evidence is that there be no valid line of reasoning or inference which could lead a jury to its conclusion. In *Cohen v Hallmark Cards* (45 NY2d 493, 499 [1978]), the Court of Appeals stated the following: "For a court to conclude as a matter of law that a jury verdict is not supported by sufficient evidence, however, requires a harsher and more basic assessment of the jury verdict. It is necessary to

first conclude that there is simply no valid line of reasoning and permissible inferences which could possibly lead rational men to the conclusion reached by the jury on the basis of the evidence presented at trial. The criteria to be applied in making this assessment are essentially those required of a Trial Judge asked to direct a verdict. It is a basic principle of our law that 'it cannot be correctly said in any case where the right of trial by jury exists and the evidence presents an actual issue of fact, that the court may properly direct a verdict' *(McDonald v Metropolitan St. Ry.,* 167 NY 66, 69-70; accord *Loewinthan v Le Vine,* 299 NY 372; *Wessel v Krop,* 30 AD2d 764). Similarly, in any case in which it can be said that the evidence is such that it would not be utterly irrational for a jury to reach the result it has determined upon, and thus a valid question of fact does exist, the court may not conclude that the verdict is as a matter of law not supported by the evidence *(see, Middleton v Whitridge, supra,* pp 507-508)."

The previous discussion of the facts shows clearly that the jury reasonably reached its verdict.

Finally, as to the claim of excessiveness, the jury heard the evidence and gave its determination as to damages for the unjustified arrest of a person and his confinement for several days. That verdict should be upheld.

For these reasons, I would reverse the judgment and reinstate the jury's verdict.

MILONAS, ELLERIN and KASSAL, JJ., concur with SULLIVAN, J. P.; SMITH, J., dissents in a separate opinion.

Judgment of the Supreme Court, New York County, entered on or about October 3, 1990, affirmed, without costs or disbursements.