[944 NYS2d 1]

BERNARD LEWIS, Respondent, v JOSEPH CAPUTO, Appellant, et al., Defendants.

First Department, April 10, 2012

### APPEARANCES OF COUNSEL

*Michael A. Cardozo, Corporation Counsel*, New York City
(*June A. Witterschein, John Hogrogian* and *Pamela Seider Dol-
gow* of counsel), for appellant.

*Michael J. Andrews, P.C.*, New York City (*Michael J. Andrews*
of counsel), for respondent.

### OPINION OF THE COURT

RENWICK, J.

Defendant Caputo, an investigator for the New York City
Department of Investigation (DOI), appeals from a jury verdict
in favor of plaintiff in an action for false arrest. The jury found
defendant liable for an unlawful arrest stemming from plaintiff's
possession of a stolen laptop computer. Defendant arrested
plaintiff despite plaintiff's denial that he knew that the laptop
he had bought from his coemployee—who turned out to be the
computer thief—was stolen, and the inability of the thief—who
was also plaintiff's accuser—to remember whether he had
informed plaintiff before the sale that the laptop was stolen. At
the conclusion of trial, defendant moved for judgment notwith-
standing the verdict or, in the alternative, to set aside the verdict
on the ground that the trial court had made prejudicial com-
ments. The principal issue in this appeal is whether the trial ev-
idence, viewed in a light most favorable to plaintiff, established
as a matter of law the affirmative defense of probable cause to
arrest.

In August 1999, the New York City Administration for
Children's Services (ACS) received a donation of 124 laptop
computers to be delivered to indigent high school students who
intended to pursue higher education. The laptops were stored at
ACS's headquarters at 150 William Street, in Manhattan. Upon
receipt of the computers, ACS immediately began to distribute

them. But not fast enough. In September, ACS discovered that some of the laptops were missing. At the time, plaintiff and his accuser, Elias Polanco, were both employed by a private firm, as computer tech assistants for ACS at 150 Williams Street.

Plaintiff testified that Polanco had told him in early September that he was seeking to sell his laptop. One day, after work, plaintiff and Polanco took the subway together and exited at Polanco's station, where plaintiff waited while Polanco went to get the laptop. Shortly thereafter, Polanco returned and handed the laptop to plaintiff, who looked at it for about 10 minutes and then brought it to his girlfriend; plaintiff had the laptop in his possession for about an hour. According to plaintiff, he was unaware at the time that ACS had received laptops or that any had been stolen. Nothing about the laptop led him to believe it was stolen or that Polanco was not its owner; it had a faulty battery, was missing a removable CD drive, and needed parts replaced.

In November, ACS notified DOI about the missing computers. Defendant Caputo (defendant), a deputy inspector general for DOI, was assigned to investigate the complaint. According to defendant, Polanco became a suspect primarily because he had access to the keys to the room where the computers were stored and because of the presence of his fingerprints on empty computer boxes in the storage room.

Defendant interviewed Polanco on January 26 and 27, 2000. During the first interview, Polanco told defendant that he had heard rumors that 16 or 17 computers were missing; defendant heard about the rumors from others, too. According to defendant, during the first interview, Polanco tried to provide an innocent explanation for the presence of his fingerprints on empty computer boxes at ACS. During the second interview, defendant concluded that Polanco had not been truthful during the first, minimizing his involvement and blaming the theft on others. Defendant testified that Polanco had described a conversation in which he told plaintiff that the laptop he had sold him was stolen; however, defendant conceded that Polanco had never said when that conversation took place. In other words, Polanco could not tell defendant whether he had told plaintiff the laptop was stolen before selling it to him.

On January 28, 2000, upon defendant's instructions, Polanco wore a wire and conducted a conversation with plaintiff during which he tried to get plaintiff to state how much he had paid for the laptop and to admit that he knew it was stolen at the time

he had taken possession of it. The transcript of the conversation between plaintiff (BL) and Polanco (EP), which was placed in evidence at trial is, in pertinent part, as follows:

"EP: You still have that computer that I sold you? Your girlfriend has it?

"BL: Yeah.

"EP: Can you give it to me, can you get it back? . . .

"BL: Why what happened?

"EP: Somebody told.

"BL: Somebody snitched?

"EP: Somebody snitched. You remember, you remember I told you how we got [']em?

"BL: Yeah.

"EP: From upstairs, how we took them from upstairs. You remember that?

"BL: Yeah.

"EP: Somebody said something and they giving me time to, like, collect them all back.

"BL: Fucking snitches, who the fuck did that?

"EP: You think I[']d be smiling if I knew who did it[?]

"BL: But you know what, you know what. O.K., where did you get them from?

"EP: From upstairs, remember I told you I got them from upstairs.

"BL: You took them out of [unintelligible] desk, some shit? So how could they blame, how could they f. . . [sic], how can they pinpoint you? They can[']t pinpoint you. They have no evidence.

"EP: Cause somebody said, and they tracked it down, and they said he[']s the one who did it . . . .

"BL: Like I don[']t want nobody, you know how nosy people is [unintelligible].

"EP: Don[']t worry about that, we cool.

"BL: Alright, word [*sic*] . . . .

"BL: You told them that you took them?

"EP: That I took them?

"BL: Yeah.

"EP: I didn[']t tell them nothing, they already knew everything. They . . . knew the date, the hour, everything, everything.

"BL: Get the fuck out of here, the hour, get the fuck out of here.

"EP: Who must have said something, it must have been Robert.

"BL: Huh?

"EP: Rob . . . you asked me . . . maybe Robert said something

"BL: Who? The guy that was with you [unintelligible]. Stupid motherfucker."

Nowhere in this conversation did plaintiff state that he knew the computer was stolen before he purchased it. Indeed, defendant, who recorded this interview, admitted at trial that plaintiff did not state during the conversation that he knew before he bought the laptop that Polanco had stolen it from ACS.

In February 2000, defendant interviewed plaintiff, who said he would try to retrieve the computer. Four months later, on May 18, 2000, defendant placed plaintiff under arrest, and the New York County District Attorney charged him with criminal possession of stolen property in the fourth degree. However, more than a year later, on June 4, 2001, the District Attorney discontinued the action. In December 2002, plaintiff commenced this action seeking damages for unlawful arrest.

During his testimony, defendant stated that he was a peace officer, and that the Criminal Procedure Law (CPL) required him to obtain authority before making an arrest. When he sought to show that he had probable cause based on a conversation in which an assistant district attorney directed him to arrest defendant, the court precluded this evidence because during discovery defense counsel had prohibited plaintiff from inquiring into that conversation. In light of defendant's inability to prove probable cause, the court initially directed a

verdict against him. However, after defense counsel asked the court to take judicial notice of a peace officer's authority to arrest as set forth in the statute in CPL 140.25 (3) (b), defendant was allowed to submit further evidence of probable cause.

In charging the jury regarding a peace officer's statutory authority to arrest, the court summarized defendant's view that he could not effect an arrest without obtaining actual authority, and stated that "that testimony appears to have not been true." Defense counsel did not, at that juncture, object or move for a mistrial based on the court's comment. It was not until the next morning that defense counsel moved for a mistrial on the ground that the court had commented prejudicially on defendant's credibility. Although counsel stated her belief that the court did not mean it in that sense, she felt that "the bell was already rung" and that it was "very prejudicial."

The court denied the motion for a mistrial, and counsel sought a curative instruction. The court declined to give a curative instruction. However, the court proposed to clarify that when it said "not true," that was not a reflection on defendant's credibility but, rather, an indication that his view was incorrect. The court ultimately gave that instruction, and no exceptions were taken.

The jury found that defendant failed to show probable cause, and awarded plaintiff $50,000 for false arrest. Defendant then moved for judgment notwithstanding the verdict on the ground that the evidence showed probable cause as a matter of law or, in the alternative, to set aside the verdict on the ground that the trial court's "not true" comment was prejudicial. The court denied the motion.

We first address defendant's argument that the trial court erred by denying the motion for a directed verdict on the claim of false arrest because the trial evidence established as a matter of law that there was probable cause for plaintiff's arrest. Before a court can conclude that a jury verdict is not supported by legally sufficient evidence, it must first find that there is "simply no valid line of reasoning and permissible inferences which could possibly lead rational [people] to the conclusion reached by the jury on the basis of the evidence presented" (*Cohen v Hallmark Cards*, 45 NY2d 493, 499 [1978]). The evidence must be viewed in the light most favorable to the prevailing party (*see Szczerbiak v Pilat*, 90 NY2d 553, 556 [1997]; *Dublis v Bosco*, 71 AD3d 817 [2010]).

A showing of probable cause is a complete defense to an action alleging false arrest or false imprisonment (*see Marrero v*

*City of New York*, 33 AD3d 556 [2006]; *Strange v County of Westchester*, 29 AD3d 676 [2006]; *Molina v City of New York*, 28 AD3d 372 [2006]). However, where, as here, an arrest is made without a warrant, it is presumed that the arrest was unlawful and defendant is required to establish the affirmative defense of probable cause (*see Lynn v State of New York*, 33 AD3d 673 [2006]; *Wallace v City of Albany*, 283 AD2d 872, 873 [2001]).

"[T]he issue of probable cause is a question of law to be decided by the court only where there is no real dispute as to the facts or the proper inferences to be drawn [therefrom]" (*Wyllie v District Attorney of County of Kings*, 2 AD3d 714, 718 [2003] [internal quotation marks omitted]; *Orminski v Village of Lake Placid*, 268 AD2d 780, 781 [2000]). Conversely, if the facts are disputed or there are varying inferences to be drawn therefrom regarding the question of probable cause, the issue is one to be determined by the jury (*Parkin v Cornell Univ.*, 78 NY2d 523, 529 [1991], citing *Veras v Truth Verification Corp.*, 87 AD2d 381, 384 [1982], *affd* 57 NY2d 947 [1982]).

In the present case, the evidence at trial gave rise to a number of factual disputes bearing on the issue of probable cause. As indicated, the basis for plaintiff's arrest was twofold: information provided by the computer thief, Polanco, and plaintiff's allegedly incriminating statements to Polanco. Initially, we note that this case presents the exception to the general rule that an accusation by an identified citizen is sufficient to provide probable cause to arrest where the witness's credibility is not at issue. *Burgio v Ince* (79 AD3d 1733 [2010]) and *Sital v City of New York* (60 AD3d 465, 466 [2009], *lv dismissed* 13 NY3d 903 [2009]), illustrate this exception. In *Burgio*, the Fourth Department upheld the trial court's denial of the defendant's motion for summary judgment on the issue of probable cause because the testimony of various witnesses contradicted the version provided by the defendant of his investigation preceding the arrest, raising issues of credibility (79 AD3d at 1735).

In *Sital*, this Court held that the defendant failed to establish the affirmative defense of probable cause as a matter of law. Specifically, this Court held that a rational jury could have found that there was no probable cause for the plaintiff's arrest because the accusation by an identified citizen, which was the sole basis for the arrest, was not sufficiently reliable, given the investigating officer's doubts about the witness's credibility (60 AD3d at 466).

Here, the information defendant obtained from his two interviews of Polanco raised doubts about the accuser's credibility. For instance, during the first interview, Polanco tried to provide an innocent explanation for the presence of his fingerprints on empty computer boxes at ACS. During the second interview, defendant concluded that Polanco had not been truthful during the first, minimizing his involvement and blaming the thefts on others. Under these circumstances, a reasonable jury could have found that defendant did not, in good faith, believe that Polanco's accusatory statements against plaintiff were credible, or that his belief did not rest on grounds that would induce an ordinarily prudent officer to believe he had probable cause to arrest plaintiff for knowing possession of stolen property.

Significantly, there is no evidence in the record indicating that plaintiff knew the computer was stolen when he purchased it. In fact, Polanco never stated that he revealed to plaintiff that the laptop was stolen before selling it to him. Indeed, defendant's use of Polanco to attempt to obtain incriminating statements from plaintiff indicated defendant's unwillingness to proceed solely on Polanco's statements that he had sold the computer to plaintiff.

Moreover, the taped conversation between Polanco and plaintiff, as summarized above, suggests, at most, that plaintiff knew as of January 28, 2000, the date of the taped conversation, that the laptop was stolen. Nowhere in the recording did plaintiff admit that he knew it was stolen several months earlier, either in late August or early September 1999, before obtaining possession of it. Absent any direct incriminating statement on the issue, defendant, at best, could infer from the recorded conversation that plaintiff knew *at some point* that he had purchased stolen property. However, given the competing inferences that could have been drawn from plaintiff's conversation with Polanco, the jury could well have concluded that plaintiff learned, in the months following his purchase of the laptop, from the rumor mill at ACS, that laptops had been stolen. Apart from this inference, there was no evidence offered by defendant to show that plaintiff had knowledge that the computer was stolen at the time he purchased it.

Nor was the circumstantial evidence at trial necessarily indicative of plaintiff's knowledge that the laptop was stolen property. For instance, while the low price of the laptop—it had a market value of $2,000 and was sold to plaintiff for $400—

could be understood as a circumstantial indicator that it was stolen, plaintiff had denied knowing of the thefts and had testified that Polanco told him it was his own laptop. Since it was a used computer needing replacement parts, purchased from a fellow computer tech working for the same employer, there was a rational basis for a reasonable juror to justify the price. Likewise, contrary to defendant's contention, adopted by the dissent, the fact that the transfer of possession took place in the subway does not necessarily suggest furtiveness or that it was obviously stolen property. Indeed, since it was supposed to be Polanco's own laptop that he was selling from his home, it would have been more difficult for him to bring it to work and transfer it to plaintiff there.

Finally, the dissent makes much of the fact that plaintiff expressed outrage that a snitch was responsible for Polanco's getting caught. However, the dissent ignores the fact that people, law abiding citizens included, have different attitudes about snitches, and life experiences contribute to those attitudes. Indeed, it is an undeniable fact that police work with informants has a checkered history in some communities. Thus, the inference to be drawn from plaintiff's derogatory remarks toward the unknown snitch was an issue within the province of the jury, not the exclusive domain of the court, under the particular circumstances of this case.

The dissent's attack on the majority's position is relentless but misguided. Contrary to the dissent's contention, the majority's position is not "that a jury question was presented because the information on which defendant relied was theoretically consistent with the hypothesis that plaintiff did not learn that the computer in question had been stolen until after he conveyed it to someone else." Rather, as the majority's analysis makes clear, in determining whether the jury verdict should stand, our analysis focuses on whether the evidence adduced at trial supports a jury finding that it was not reasonable for defendant to conclude that plaintiff had committed a crime. Thus, the dissent's assertion that the majority is "[l]aboring under a misconception of the central issue in the case" does not ring true.

■ On the contrary, viewing the facts in the light most favorable to plaintiff and drawing every inference in his favor (*see Szczerbiak v Pilat*, 90 NY2d 553, 556 [1997]), a rational jury could have found that there was no probable cause for plaintiff's arrest because the accusation from the criminal suspect, made

four months before plaintiff's arrest, was not sufficiently reliable, particularly given that the investigating officer had doubts about the accuser's credibility and the accuser did not tell defendant that he had revealed to plaintiff that the laptop was stolen before selling it to him. A rational jury could have found lack of probable cause for plaintiff's arrest because the evidence upon which defendant relied to conclude that plaintiff knew at the time of purchase that the laptop was stolen property was highly equivocal. Under the circumstances, it simply cannot be said that there is no valid line of reasoning and permissible inferences that could possibly have led rational people to the conclusion reached by the jury on the basis of the evidence presented here (*Cohen v Hallmark Cards*, 45 NY2d 493, 499 [1978]).

■ The trial court also correctly denied defendant's motion to set aside the verdict on the ground of prejudicial comments by the court. Contrary to defendant's contention, the court's comment that defendant's testimony regarding his authority as a peace officer was "not true" was directed, as defense counsel conceded at trial, not at defendant's veracity but at the accuracy of his legal opinion; it was not prejudicial. In any event, defendant's objection and motion for a mistrial were untimely. Moreover, the court gave an appropriate curative instruction that was not objected to and is presumed to have been followed by the jury (*see Askin v City of New York*, 56 AD3d 394, 395-396 [2008], *lv dismissed* 12 NY3d 769 [2009]).

Accordingly, the judgment of the Supreme Court, New York County (Milton A. Tingling, J.), entered May 5, 2009, after a jury trial, awarding plaintiff the principal sum of $50,000 as against defendant Joseph Caputo, and bringing up for review the order of the same court and Justice, entered June 30, 2008, which denied defendant Caputo's motion for judgment notwithstanding the verdict, or, in the alternative, to set aside the verdict, should be affirmed, without costs.

FRIEDMAN, J. (dissenting). Plaintiff was arrested for criminal possession of a laptop computer stolen from his workplace at the City of New York's Administration for Children's Services (ACS) after he was caught on tape making inculpatory statements to the coworker who sold it to him. The seller (who was wearing a hidden recording device) requested that plaintiff get the laptop back from his girlfriend (to whom he had given it) because "[s]omebody told." Plaintiff's first reaction to this request was to ask, not "What are you talking about," but:

"Somebody snitched?" In addition, plaintiff responded in the affirmative when the seller asked if he "remember[ed]" that he had been told that the seller "took them [(the 17 computers that had been stolen)] from upstairs." Later in the conversation, plaintiff asked who the informant was; used obscene language to refer to the informant; asserted his disbelief that the authorities could "pinpoint" the seller as the thief; and, when the seller asked him to turn down the music he was playing, expressed concern that the conversation not be overheard by "nosy" people. While it is evident from the transcript of the conversation that plaintiff was outraged that someone had exposed the scheme and anxious about the possibility that his involvement might be discovered, at no point in the conversation did he express surprise, anger or even regret that he had been sold a stolen computer.[1]

---

1. The transcript of the recorded conversation between plaintiff (BL) and the seller (EP), which was placed in evidence at trial, runs in part as follows:

"EP: You still have that computer I sold you? Your girlfriend has it?

"BL: Yeah.

"EP: Can you give it to me, can you get it back? . . .

"BL: Why what happened?

"EP: Somebody told.

"BL: Somebody snitched?

"EP: Somebody snitched. You remember, you remember I told you how we got [']em?

"BL: Yeah.

"EP: From upstairs, how we took them from upstairs. You remember that?

"BL: Yeah.

"EP: Somebody said something and they giving me time to, like, collect them all back . . . .

"BL: Fucking snitches, who the fuck did that?

"EP: You think I[']d be smiling if I knew who did it[?]

"BL: But you know what, you know what. O.K., where did you get them from?

"EP: From upstairs, remember I told you I got them from upstairs.

"BL: You took them out of [unintelligible] desk, some shit? So how could they blame, how could they f. . . [sic], how can they pinpoint you? They can[']t pinpoint you? They have no evidence.

"EP: Cause somebody said, and they tracked it down, and they said he[']s the one who did it. Lower that music, lower it down.

"BL: Like I don[']t want nobody, you know how nosy people is [unintelligible].

"EP: Don[']t worry about that, we cool.

"BL: Alright, word [sic] . . . .

When plaintiff was arrested, his recorded conversation with the seller was not the only evidence in investigators' possession supporting their belief that plaintiff had purchased the laptop knowing it was stolen. Before the recorded conversation took place, the seller, Elias Polanco, was twice interviewed by defendant Joseph Caputo, a deputy inspector general of the City's Department of Investigation. In the second interview, Polanco admitted, among other things, that he and another ACS worker had stolen the 17 missing computers, that he had sold one of those laptops to plaintiff, and that, at some unspecified time, he had told plaintiff that the laptop Polanco sold him had been stolen from ACS. Indeed, Polanco averred that it was common knowledge at ACS headquarters that the computers Polanco was selling had been stolen from the agency. Polanco told defendant that he had sold plaintiff the stolen laptop—which had a market value of more than $2,000 at the time—for about $400, and that he had handed the device over to plaintiff, not at their common workplace, but in a subway station.

Finally, after defendant had plaintiff's conversation with Polanco on tape, defendant interviewed plaintiff about his purchase of the laptop. Defendant asked plaintiff to write a statement, and plaintiff began to write. While plaintiff was writing, defendant told him that he "should have no trouble" if his written statement was consistent with the oral statements he made during the recorded conversation with Polanco. At that point, according to defendant's testimony, plaintiff "tore up" the written statement he had been preparing.

On May 18, 2000, based on the information obtained from plaintiff's recorded conversation with Polanco and defendant's interviews with Polanco and plaintiff, defendant placed plaintiff under arrest, and the New York County District Attorney charged him with criminal possession of stolen property in the fourth degree, a felony. Plaintiff was one of eight individuals

---

"BL: You told them that you took them?

"EP: That I took them?

"BL: Yeah.

"EP: I didn[']t tell them nothing, they already knew everything. They knew the date, they knew the date, the hour, everything, everything.

"BL: Get the fuck out of here, the hour, get the fuck out of here.

"EP: Who must have said something, it must have been Robert.

"BL: Huh?

"EP: Rob . . . you asked me . . . maybe Robert said something.

"BL: Who? The guy that was with you [unintelligible]. Stupid motherfucker."

who worked at the ACS offices who were arrested and charged with felonies based on the theft, sale and illegal possession of 17 laptop computers valued at over $40,000. Sixteen of those computers—including the one plaintiff furtively purchased from Polanco—had been donated to ACS for distribution to college-bound children in foster care.

On June 4, 2001, the charge against plaintiff was dismissed upon the motion of the District Attorney. Although plaintiff had been free on his own recognizance during the entire period from his arrest until the charge's dismissal, he commenced this action for false arrest against defendant Caputo, the City investigator who interviewed him and placed him under arrest. Defendant now appeals from a $50,000 judgment for plaintiff that was entered on a jury verdict after the court denied defendant's motion for judgment notwithstanding the verdict.

As a result of the judgment, the City, which is defending defendant and presumably will indemnify him, faces having the loss represented by the theft of the computers and the costs of the investigation and the defense of this action compounded by the loss of an additional $50,000 to be paid to plaintiff. If the judgment stands, plaintiff is to receive these damages notwithstanding a record establishing that, based on information that included incriminating statements out of plaintiff's own mouth, defendant reasonably believed that plaintiff knowingly purchased a computer stolen from the City and disposed of it to a third party not entitled to it. This prospect apparently does not trouble the majority, but—considering the uncontroverted facts of this case that establish that defendant did nothing wrong—it troubles me to impose this further cost on the City.

In my view, the judgment should be reversed and the complaint dismissed because the record establishes, as a matter of law, that the arrest of plaintiff was supported by probable cause to believe that he purchased the laptop computer from Polanco, and gave it to his girlfriend, with knowledge that the computer had been stolen. I therefore respectfully dissent from the majority's affirmance of the judgment.

In an action for false arrest based on an arrest effected without a warrant, the defendant may establish a complete defense by proving that the arrest was supported by probable cause to believe that the plaintiff had committed a felony. Probable cause means "such grounds as would induce an ordinarily prudent and cautious person, under the circumstances, to believe that [the person arrested] had committed [a] felony"

(*Smith v County of Nassau*, 34 NY2d 18, 25 [1974]). "Probable cause does not require proof sufficient to warrant a conviction beyond a reasonable doubt but merely information sufficient to support a reasonable belief that an offense has been or is being committed" (*People v Bigelow*, 66 NY2d 417, 423 [1985]; *see also Brinegar v United States*, 338 US 160, 175 [1949]; *People v Rodriguez*, 84 AD3d 500, 501 [2011], *lv denied* 17 NY3d 861 [2011]; *People v Kettermann*, 56 AD3d 323 [2008], *lv denied* 12 NY3d 784 [2009]). Stated otherwise, an arrest "need not be supported by information and knowledge which, at the time, excludes all possibility of innocence and points to [the arrested person's] guilt beyond a reasonable doubt" (*People v Nowell*, 90 AD2d 735, 736 [1982] [internal quotation marks omitted]). "As the very name suggests, probable cause depends upon probabilities, not certainty" (*People v Rodriguez*, 168 AD2d 520, 521 [1990], *lv denied* 78 NY2d 926 [1991] [internal quotation marks omitted]). It follows that probable cause may be based upon circumstantial evidence (*see People v Teasley*, 88 AD3d 490, 491 [2011]; *Rodriguez*, 84 AD3d at 501; *Kettermann*, 56 AD3d at 323).

The crucial point in deciding this appeal is that, in an action for false arrest, "[w]here there is no real dispute as to the facts or the proper inferences to be drawn from such facts, the issue of probable cause is a question of law to be decided by the court" (*Brown v Sears Roebuck & Co.*, 297 AD2d 205, 210 [2002], citing *Parkin v Cornell Univ.*, 78 NY2d 523, 529 [1991]; *see also Orminski v Village of Lake Placid*, 268 AD2d 780, 781 [2000]; *Maxwell v City of New York*, 156 AD2d 28, 31 [1990]). Notably, in *Maxwell*, this Court affirmed Appellate Term's order overturning a jury verdict in favor of the plaintiff on a claim for false arrest, notwithstanding that the plaintiff had been "incarcerated for 24 days for a crime which he clearly did not commit" (*id.*). We held that the defendant was entitled to dismissal of the claim because the record established that "the police had probable cause to arrest plaintiff as a matter of law, and it was error [for the trial court] to submit that question to the jury and also to deny defendant's motion for judgment notwithstanding the verdict" (*id.*).

In considering whether the evidence is sufficient to support the judgment in favor of plaintiff, it should be borne in mind that the relevant "inferences to be drawn from [the] facts" in an action for false arrest do not concern whether the plaintiff was actually guilty or innocent, but whether the defendant, in

making the arrest, could reasonably infer that the plaintiff was guilty, "irrespective of [his] innocence" (*Smith v County of Nassau*, 34 NY2d at 23). Stated more succinctly, the question is one of an inference about what was, under the circumstances, a permissible inference. Thus, a showing of probable cause is not negated by the plaintiff's offering an innocent explanation of his conduct or an otherwise self-exculpatory account of what occurred (*see Baker v City of New York*, 44 AD3d 977, 980 [2007], *lv denied* 10 NY3d 704 [2008]; *Drayton v City of New York*, 292 AD2d 182, 183 [2002], *lv denied* 98 NY2d 604 [2002]; *Orminski*, 268 AD2d at 781; *Quigley v City of Auburn*, 267 AD2d 978, 979 [1999]; *Coleman v City of New York*, 182 AD2d 200, 205 n [1992] ["An accused's exculpatory statement does not, of course, negate the existence of probable cause"]). Similarly, "conflicting evidence . . . is relevant to the issue of whether guilt beyond a reasonable doubt could have been proved at a criminal trial, not to the initial determination of the existence of probable cause" (*Agront v City of New York*, 294 AD2d 189, 190 [2002], citing *Gisondi v Town of Harrison*, 72 NY2d 280, 285 [1988]). As illustrated by the decisions just cited, among others, in numerous civil cases raising the issue of probable cause for an arrest or prosecution, appellate courts have held that the undisputed facts established that probable cause existed as a matter of law, regardless of the plaintiff's actual guilt or innocence.

Notwithstanding the information defendant received from Polanco, the recording of plaintiff himself expressing dismay that the scheme had been exposed by "snitches," and plaintiff's tearing up of his written statement when defendant reminded him that it would be compared with his recorded statements to Polanco, the majority—for the most part—takes the position that the jury could rationally find that defendant lacked probable cause to arrest plaintiff. In this regard, the premise of the majority's position appears to be that a jury question was presented because the information on which defendant relied was theoretically consistent with the hypothesis that plaintiff did not learn that the computer in question had been stolen until after he conveyed it to someone else. As previously noted, Polanco never told defendant when he informed plaintiff that he had stolen the computer, and plaintiff—although he clearly knew before his recorded conversation with Polanco on January 28, 2000 that the computer was stolen—did not say anything during that conversation indicating precisely when he became aware that the computer was stolen.

Still, the information available to defendant was consistent with plaintiff's innocence only in the most technical sense—and then only with the near-complete suspension of common sense. To be clear, there is nothing in the record (other than plaintiff's self-serving statements when interviewed by defendant and in subsequent litigation) to indicate that plaintiff received and transmitted the computer innocently. Moreover, plaintiff's recorded January 28, 2000 conversation with Polanco makes plain that he not only had learned of the illicit source of the computer by that time but that (1) he was not angry at Polanco for having sold him stolen property (indeed, he did not voice any objection at all to Polanco's action in this regard); (2) he was, on the other hand, quite angry to learn that "snitches" had exposed the scheme; (3) he was interested in ascertaining the identity of the supposed informant; and (4) he was concerned to avoid having his involvement in the matter come to light. It cannot be seriously suggested that these were the reactions of an innocent purchaser for value.[2] The low price that plaintiff paid for the computer, relative to its market value, was also circumstantially suggestive of an illicit transaction. Finally, that the laptop computer was passed to plaintiff in a subway station, rather than at the ACS offices (where both Polanco and plaintiff worked), strongly suggested that both men wished to conduct the transaction furtively. Beyond question, the foregoing information tended to show consciousness of guilt on plaintiff's part and supported the inference that it was "more probable than not" (*People v Quarles*, 187 AD2d 200, 204 [1993], *lv denied* 81 NY2d 1018 [1993] [internal quotation marks omitted]) that he had knowingly received from Polanco, and then conveyed to another person, property he knew to be stolen.

The majority appears to regard the jury question in this case as having been whether the jurors themselves were persuaded, based on the information defendant relied upon in making the arrest, that plaintiff committed the crime for which he was arrested. Stated otherwise, the majority essentially views this matter as if it were a civil version of a criminal prosecution, with the stake being the accused's entitlement to damages if he wins rather than his liability to a penal sanction if he loses. The issue to be determined, however, was not plaintiff's underlying guilt or innocence but the reasonableness of defendant's conclu-

---

**2.** Indeed, if the matter were not so serious, the proposition would be laughable.

sion that probable cause existed for plaintiff's arrest to face further proceedings to adjudicate his guilt or innocence.

Laboring under a misconception of the central issue in the case, the majority repeatedly goes astray in its discussion of the evidence. For example, the majority, in discussing plaintiff's recorded conversation with Polanco, states: "[G]iven the competing inferences that could have been drawn from plaintiff's conversation with Polanco, the jury could well have concluded that plaintiff learned, in the months following his purchase of the laptop, from the rumor mill at ACS, that laptops had been stolen." If, as the majority here concedes, "competing inferences" about plaintiff's guilt or innocence could legitimately be drawn from the recorded conversation, then plaintiff has no viable claim against defendant for drawing the adverse inference, even if the jury in this case drew a more favorable inference from the same evidence. Similarly, that plaintiff presented evidence that the computer he purchased was in suboptimal condition may have provided "a rational basis . . . to justify the price" he paid, but does nothing to undercut the rationality of the competing inference drawn by defendant that plaintiff knew he was purchasing a stolen computer. With regard to the transfer of the computer in a subway station, the majority's view that the choice of this suspicious location for the transaction "does not necessarily suggest furtiveness or that it was obviously stolen property" has no relevance to the question of whether defendant reasonably reached a different conclusion.[3]

The majority's view that the jury might rationally have concluded that the evidence before it did not prove plaintiff's guilt has no relevance to the question that was actually at issue in this civil suit for damages against a public servant. To reiterate, that question was whether the information defendant relied upon in making the arrest gave him a reasonable basis for believing that plaintiff probably committed the crime, even if

---

**3.** The majority states: "[S]ince it was supposed to be Polanco's own laptop that he was selling from his home, it would have been more difficult for him to bring it to work and transfer it to plaintiff there." This makes little sense. According to plaintiff, he and Polanco took the subway after work to Polanco's stop, where they both got off the train and, while plaintiff waited in the station, Polanco went to his home, retrieved the computer, and brought it back to the station, where he gave it to plaintiff. It would appear to have been far easier for Polanco simply to bring the laptop computer to work in the morning and give it to plaintiff there. Thus, defendant had every right to infer from the location of the transfer a mutual intent to keep the transaction secret.

others viewing the same evidence might reasonably disagree with that assessment. Thus, that the circumstantial evidence defendant relied upon was, in the majority's view, not *"necessarily* indicative" (emphasis added) of plaintiff's guilt should be immaterial to the probable cause analysis so long as his guilt could reasonably be inferred—even if not beyond a reasonable doubt—from that evidence. Similarly, it should make no difference that plaintiff's recorded statements demonstrating that he was aware in January 2000 that the computer had been stolen might—theoretically—be consistent with a hypothetical scenario in which plaintiff did not learn that the computer was stolen until after it was out of his possession. Defendant, as a peace officer, was entitled to draw the inferences flowing most naturally from the information he relied upon, regardless of the ability of plaintiff's counsel—or the majority—to propose hypotheses explaining away each piece of information at issue, after the fact, so as to harmonize that information, in theory, with plaintiff's hypothetical innocence.

To reiterate, "probable cause depends upon probabilities, not certainty" (*Rodriguez*, 168 AD2d at 521), and requires neither proof beyond a reasonable doubt nor the exclusion of all possibility of innocence (*see Nowell*, 90 AD2d at 736). The implication of the majority's position is that circumstantial evidence (which can almost always be theoretically explained away) can never support a finding of probable cause. Not surprisingly—given that even a conviction can be based on circumstantial evidence—this is not the law (*see Teasley*, 88 AD3d at 491 ["a chain of circumstantial evidence . . . was sufficient to establish probable cause"]; *Rodriguez*, 84 AD3d at 501 [a description matching defendant, although, "standing alone, (it) would have fit too many people to justify an arrest," established probable cause "when taken together with strong circumstantial evidence linking defendant to one of the other suspects"]; *Kettermann*, 56 AD3d at 323 ["The circumstantial evidence in the possession of the police was sufficient to establish probable cause"]).

The majority also goes astray in holding that

> "a reasonable jury could have found that defendant did not, in good faith, believe that Polanco's accusatory statements against plaintiff were credible, or that his belief did not rest on grounds that would induce an ordinarily prudent officer to believe he had probable cause to arrest plaintiff for knowing possession of stolen property."

While it is true that defendant concluded that Polanco had been lying during his first interview (at which he denied any involvement with the missing computers), for purposes of determining probable cause, defendant's conclusion that Polanco had been lying during the first interview did not, as a matter of law, render unreasonable defendant's reliance on Polanco's statements during the second interview, when he admitted stealing the computers and identified plaintiff as the purchaser of one.

Given law enforcement's frequent need to rely on the statement of one criminal to apprehend another, it is not surprising that the Court of Appeals has long recognized that probable cause for an arrest may be based on information supplied by a person who is *not* generally credible or trustworthy where circumstances otherwise show that the specific information relied upon is credible (*see People v DiFalco*, 80 NY2d 693, 696-697 [1993] [determination of veracity of information received from informant as basis for warrantless arrest "requires a showing *either* that the informant is credible and the information supplied may, for that reason, be accepted as true *or*, in the absence of such showing, that the specific information given is reliable"]; *People v Comforto*, 62 NY2d 725, 727 [1984]). In particular, where—as here—the informant is himself a criminal suspect and thus not generally trustworthy, a peace officer may rely upon the informant's admissions against his own penal interest (*see DiFalco*, 80 NY2d at 697 n 2; *People v Johnson*, 66 NY2d 398, 403 [1985]; *Comforto*, 62 NY2d at 727; *People v Rodriguez*, 52 NY2d 483, 490 [1981]; *People v Walker*, 27 AD3d 899, 900 [2006], *lv denied* 7 NY3d 764 [2006]; *People v Muir*, 3 AD3d 597, 598 [2004], *lv denied* 1 NY3d 631 [2004]; *People v Stroman*, 293 AD2d 350 [2002], *lv denied* 98 NY2d 702 [2002]; *People v Miranda*, 293 AD2d 344 [2002], *lv denied* 98 NY2d 678 [2002]; *People v Daily*, 287 AD2d 293 [2001], *lv denied* 97 NY2d 680 [2001]).

While Polanco's statement that he sold a stolen computer to plaintiff, standing alone, could be deemed reliable as an admission against Polanco's penal interest (*see Muir*, 3 AD3d at 598, citing *People v Benjamin*, 150 AD2d 952, 953 [1989]), defendant did not rely on that statement alone as grounds for plaintiff's arrest. Plaintiff was not arrested until defendant obtained ample corroboration of Polanco's statement in the form of the recorded self-incriminating statements made by plaintiff himself during his conversation with Polanco on January 28, 2000. It is true that the recorded conversation did not directly reveal

exactly when plaintiff learned that the computer was stolen (although he clearly knew before the conversation that the computer was stolen). Nonetheless, plaintiff's statements during the conversation were far more than merely suggestive of his guilt. The natural and inescapable inference from plaintiff's statements to Polanco expressing anger that the scheme had been exposed by "snitches" and concern to keep his involvement secret, among other things, is that he believed that Polanco's exposure as a thief placed him at risk because his purchase of the computer was not innocent (see *Muir*, 3 AD3d at 598 [probable cause for arrest existed where informant's statements against penal interest were "corroborated to some extent by the monitored telephone conversations which lend credence to the information" supplied by informant]).[4]

The main thrust of the majority's argument is that there was a triable issue concerning probable cause to be submitted to the jury. At one point in its writing, however, the majority goes even beyond that claim to assert that "there is *no* evidence in the record indicating that plaintiff knew the computer was stolen when he purchased it" (emphasis added). This statement— which perhaps results from the realization that the verdict becomes insupportable once the evidence of plaintiff's guilt is acknowledged—is an astounding distortion of the case. As is plain from the rage and apprehension plaintiff expressed in his

---

4. *Sital v City of New York* (60 AD3d 465 [2009], *lv dismissed* 13 NY3d 903 [2009]), on which the majority relies, does not support affirming the judgment here. There is no indication in the *Sital* decision that the witness's statement that provided the basis for arresting the plaintiff in that case was against the witness's penal interest. Moreover, "the investigating officer had doubts about the witness's credibility" (*id.* at 466); the identification of the plaintiff was "arguably contradicted by physical evidence from the crime scene that was consistent with a conflicting statement of an independent eyewitness" (*id.*); and there was evidence that the investigating officer was prejudiced against the plaintiff based on a prior arrest (*id.*). On that record, we held, "[A] rational jury could have determined that the officer's failure to make further inquiry of potential eyewitnesses was unreasonable under the circumstances" (*id.*). Here, by contrast, Polanco's implication of plaintiff was both against his penal interest and corroborated by plaintiff's own recorded statements, while the record discloses no countervailing exculpatory evidence. Also misplaced is the majority's reliance on the Fourth Department's decision in *Burgio v Ince* (79 AD3d 1733 [2010]), in which there was conflicting evidence about the truthfulness of the defendant arresting officer's account of his investigation. As the court stated in *Burgio*: "[T]he deposition testimony of various witnesses contradicts the version provided by defendant of his investigation, raising issues of credibility that preclude summary judgment" (*id.* at 1735). The case did not raise any issue of a peace officer's right to rely on information provided by an informant against his own penal interest.

recorded conversation with Polanco, and from plaintiff's tearing up his written statement upon learning that the tape existed, the record is replete with *circumstantial* evidence that plaintiff did not buy the laptop innocently. Even if defendant did not have *direct* evidence of plaintiff's guilt—which is presumably what the majority means when it makes the otherwise inaccurate statement that "there is no evidence" of plaintiff's guilt—defendant was, as a matter of law, entitled to rely on circumstantial evidence of guilt in determining to make the arrest (*see Teasley*, 88 AD3d at 491; *Rodriguez*, 84 AD3d at 501; *Kettermann*, 56 AD3d at 323).[5]

The majority, glossing over plaintiff's tape-recorded denunciation of "snitches," asserts that defendant had no basis for inferring that plaintiff knowingly purchased stolen property "[a]bsent any direct incriminating statement on the issue." The majority appears to forget that intent is *usually* proven through circumstantial evidence. "Because intent is an invisible operation of [the] mind, direct evidence is rarely available (in the absence of an admission) and is unnecessary where there is legally sufficient circumstantial evidence of intent" (*People v Rodriguez*, 17 NY3d 486, 489 [2011] [internal quotation marks and citation omitted]). In fact, the Court of Appeals has expressly held that knowledge that property is stolen—precisely the kind of intent at issue here—"can be established through circumstantial evidence 'such as by . . . [the accused's] conduct or contradictory statements from which guilt may be inferred' " (*People v Cintron*, 95 NY2d 329, 332 [2000], quoting *People v Zorcik*, 67 NY2d 670, 671 [1986]). It makes no sense for the majority to say that the circumstantial evidence of plaintiff's intent—which would have sufficed to support a conviction at a criminal trial—did not suffice to provide probable cause for his arrest.

Realizing the flimsiness of plaintiff's arguments for affirming a judgment that holds a public servant liable for doing his job in an entirely competent and lawful fashion, the majority fashions a new argument, not raised by plaintiff himself, for the result it prefers to reach. Thus, the majority speculates that the jury

---

5. To the extent the majority is suggesting that the record does not contain even circumstantial evidence of plaintiff's guilt, it is flatly wrong. I note that, if the majority were correct in stating that "there is no evidence" of plaintiff's guilt, it would follow that the case, rather than being submitted to the jury, should have been disposed of by directed verdict. Understandably, the majority refrains from spelling out that implication.

may have attributed plaintiff's expression of outrage over the exposure of the scheme by a "snitch" to an antagonism to informants that, the majority tells us, prevails among some portions of the public, "law abiding citizens included." It bears repeating that plaintiff did not raise this argument at trial or on appeal, and the majority points to no evidence for it in the record. Putting all that aside, it remains the case that, even when an accused himself offers a self-exculpatory explanation of his conduct, that explanation does not negate probable cause for an arrest that otherwise arises from the information available to law enforcement. As Justice Sullivan of this Court wrote nearly 20 years ago, "An accused's exculpatory statement does not, of course, negate the existence of probable cause" (*Coleman*, 182 AD2d at 205 n). If it were otherwise, it is difficult to see how the law could be effectively enforced. Here, the majority seeks to save an irrational verdict for plaintiff, in the face of probable cause for his arrest that fairly leaps from the record, by offering an exculpatory explanation of plaintiff's conduct that plaintiff himself never presented to the jury. The majority's speculation that plaintiff's anger at "snitches" did not necessarily arise from his own consciousness of guilt might well have made a good closing argument for the defense had the criminal case against plaintiff gone to trial. As an after-the-fact rationalization of a patently irrational verdict—a rationalization that, to reiterate, not even plaintiff has deemed worthy to offer—it is entirely out of place.

The majority asserts that my argument for reversal is "relentless but misguided." I believe that my arguments are not "misguided" but, on the contrary, guided by numerous precedents applying well established principles of the law of probable cause—principles and precedents that, for the most part, the majority ignores. Further, it does not trouble me to be described as "relentless" in opposing a decision that requires the City of New York, at a time of fiscal stress, to divert resources from public needs to the enrichment of an individual whom the City has not wronged in any way, as the record establishes as a matter of law. Whether that individual wronged the City and the children ACS serves—as defendant reasonably concluded he did, based on the evidence in the present record—is, of course, a question that is not before us.

For the foregoing reasons, the judgment for plaintiff should be reversed, defendant's motion for judgment notwithstanding the verdict granted, and the complaint dismissed. Accordingly, I respectfully dissent from the affirmance of the judgment.

TOM, J.P., and CATTERSON, J., concur with RENWICK, J.; FRIEDMAN and ABDUS-SALAAM, JJ., dissent in a separate opinion by FRIEDMAN, J.

Judgment, Supreme Court, New York County, entered May 5, 2009, affirmed, without costs.